IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

SEAN VINCENT,

                                        INDEX NO. 14-cv-7744 (VSB)

                    PLAINTIFF,

    vs.                                 FIRST AMENDED
                                        COMPLAINT

DEPUTY INSPECTOR EDWARD WINSKI,     Jury Trial Demanded
NEW YORK CITY POLICE CAPTAIN THOMAS
TRAYNOR, THE CITY OF NEW YORK, a
municipal entity, NEW YORK CITY POLICE
OFFICER LISA WARING (SHIELD "2987");
NEW YORK CITY POLICE OFFICER JOHN MCNAMARA
(SHIELD "22960"), NEW YORK CITY POLICE
OFFICER EDWARD BLANCO (SHIELD "11035"),
NEW YORK CITY POLICE OFFICER WILLIAM
CURLEY (SHIELD "01500"), NEW YORK CITY
POLICE OFFICER WILLIAM GRODNICK (SHIELD
"04729"), NEW YORK CITY POLICE OFFICER
THOMAS MANNING (SHIELD "10032"),
NEW YORK CITY POLICE OFFICERS "JOHN DOES
1-10", NEW YORK CITY SUPERIVISING POLICE
OFFICERS "RICHARD ROES 1-10",(FORMER)
MAYOR MICHAEL R. BLOOMBERG, and
(FORMER) NEW YORK CITY POLICE
COMMISSIONER RAYMOND W. KELLY;

                    DEFENDANTS.

_____

        Plaintiffs, SEAN VINCENT, by his attorney, STECKLOW & THOMPSON,

complaining of the defendants, respectfully alleges as follows:

## I. PRELIMINARY STATEMENT

1.      In early 2011, SEAN VINCENT was a youthful true believer in the power of peaceful
assembly to affect political and social change. Acting on this belief, he became involved with the
Occupy Wall Street ("OWS") movement.

2.      OWS is a movement that, inter alia, protests the institutionalized inequality in this
country that funnels almost all the nation's political power, wealth and resources to a tiny
fraction of people and their corporations, and denies the vast majority of ordinary Americans
their fair share. SEAN VINCENT was very active in organizing and/or participating in the

activities of OWS, including taking a lead position on many of the protest marches that were the hallmark of Occupy Wall Street in Zuccotti Park.

3.      From September 2011 until December 2012, SEAN VINCENT lived in New York City, working many hours as an activist organizing and participating in protest activities.  On each date of arrest that he suffered between September 17, 2011 and December 25, 2011, he was participating in expressive speech activities including protests, marches concerning Occupy Wall Street issues of economic inequality and the usurpation of power in this country by corporations and the 1%.  The Plaintiff's activities also included participating in planning meetings and the OWS General Assembly meetings at Zuccotti Park.

4.      In a matter of seventy (70) days, SEAN VINCENT was arrested while participating in First Amendment activity for the first, second, third, fourth, fifth and sixth time in his life; each time unlawfully and each time by the NYPD.

5.      The Defendant POLICE OFFICERS arrested Plaintiff SEAN VINCENT while he participated in protest activities protected by the First Amendment to the U.S. Constitution on:

     a.  October 15, 2011, in or around 37th Street and 6th Avenue;

     b.  October 26, 2011, in or around Broadway and Reade Streets;

     c.  November 8, 2011, in and around Zuccotti Park; and

     d.  November 27, 2011 in and around Zuccotti Park.[1]

## JURISDICTION AND VENUE

6.      Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, for declaratory judgment, monetary damages, and to redress Defendants' violations of his rights under the First, Fourth and Fourteenth Amendments of the United States Constitution.

7.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

8.      Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

9.      Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

## JURY DEMAND

10.      Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

11.      Plaintiff SEAN VINCENT is a resident of the State of North Carolina,  City of Charlotte, and the County of Mecklenburg.

---

[1] In this complaint, the Plaintiff makes no claims for damages relating to his first two arrests on September 24, 2011 and October 1, 2011.

12.     Defendant City of New York is a municipal corporation organized under the laws of the State of New York.

13.     Defendant City of New York maintains the New York City Police Department ("NYPD"), which is authorized to perform all functions of a police department per the applicable sections of the New York State Criminal Procedure Law.

14.     Each individual defendant is sued in sued in both their official and individual capacities.

15.     All of the acts of the City of New York, its agents and employees, including the individual defendants named herein, were carried out under the color of state law.

16.     Defendant Michael Bloomberg was the Mayor of the City of New York and took a direct interest in overseeing the policing of Occupy Wall Street.  At all times relevant to the conduct of the NYPD, he was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and responsible for the appointment, training, supervision, and conduct of the highest ranking NYPD personnel.  As Mayor of the City of New York, Michael Bloomberg was a policy-maker with respect to the decisions on training and supervision of police officers in relation to Occupy Wall Street and expressive speech activity protected by the First Amendment to the United States Constitution.

17.     Defendant Former Commissioner Ray Kelly ("Commissioner Kelly") was an employee and agent of the NYPD was acting within the scope of his employment. At all times relevant to the conduct of the NYPD, he was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and responsible for the appointment, training, supervision, and conduct of all of the NYPD members of service including the highest ranking NYPD personnel.

18.     Defendant INSPECTOR EDWARD WINSKI, was an officer of the NYPD, acting within the scope of his employment.  On the date of the incidents referenced herein, he was assigned to the 1st Precinct.

19.     Defendant  NEW YORK CITY POLICE JOHN MCNAMARA (SHIELD "22960"), was an officer of the NYPD, acting within the scope of his employment.

20.     Defendant POLICE EDWARD BLANCO  ("Defendant PO BLANCO") was an officer the NYPD, acting within the scope of his employment.

21.     Defendant POLICE WILLIAM CURLEY ("Defendant PO CURLEY") was an officer of the NYPD, acting within the scope of his employment.

22.     Defendant POLICE OFFICER WARING ("Defendant PO WARING") was an officer of the NYPD, acting within the scope of her employment.

23.     Defendant POLICE OFFICER WILLIAM GRODNICK  ("Defendant PO GRODNICK") was an officer of the NYPD, acting within the scope of his employment.

24.     Defendant POLICE CAPTAIN THOMAS TRAYNOR ("Defendant CAPTAIN TRAYNOR") was an officer of the NYPD, acting within the scope of his employment.

25.     Defendant POLICE OFFICER THOMAS MANNING ("Defendant PO MANNING") was an officer of the NYPD, acting within the scope of his employment.

FACTS COMMON TO ALL CLAIMS

26.     OWS, among other things, protests the institutionalized inequality that funnels political power, wealth, and resources to a tiny fraction of people and their corporations, and denies the vast majority of ordinary Americans and people their fair share.

27.     In particular, OWS sought, and seeks, to bring attention to the unfair way in which ordinary people are allowed to suffer terrible hardship due to mortgage debt, student loan debt, or lack of affordable healthcare, as politicians and businessmen blame these people for "irresponsibility," while huge banks were rescued from any consequences of their own decision-making and actions by government bailouts funded by those same ordinary people's taxes.

28.     On September 17, 2011, the first OWS march occurred in the Financial District of Manhattan and the protesters were blocked from entering the Wall Street area by the NYPD, who had set up narrow choke points of ingress and egress.  The protesters found their way to Zuccotti Park and formed a protest encampment there.  Sean Vincent was part of this first OWS march.

29.     From September 17, 2011 to November 15, 2011, the Zuccotti Park protest encampment continued 24 hours a day without interruption, pursuing their political speech goals of drawing attention and raising awareness to the many issues of inequity.  Sean Vincent was part of the occupation from the first day until the encampment was evicted by police.

30.     From September 17, 2011 to November 15, 2011, the 24-hour occupation of Zuccotti Park by OWS protestors was lawful.[2]

31.     The Zuccotti Park protest included much more than simply protestors occupying space. Each day the occupiers held one or more General Assemblies, open meetings run on a non-hierarchical model striving for pure democracy, in which participants debated and voted on plans and policies for the movement.

32.     A sub-group of protestors at Zuccotti Park engaged in communications and media, both locally and through the internet. Many protestors, some involved with the media group and some not, used live-streaming technology to broadcast what was happening at assembly meetings and protests to the world.  Another group set up a library.

33.     In addition to occupying Zuccotti Park, the OWS protestors organized marches and demonstrations, both large and small, on a near-daily basis throughout New York City.  Both before and after the eviction, marches often originated or terminated at Zuccotti Park.

34.     On November 15, 2011, the NYPD executed a military raid on Zuccotti Park at 1:00AM. The NYPD closed the airspace above lower Manhattan.  They deployed klieg lights to disorient the occupiers.  Press were removed from the area and kept at a distance where they could not witness the police storm the park.  Police in riot gear cleared the park by force.  Protestors' possessions, including the library, were consumed by a fleet of garbage trucks before dawn.

35.     After the police evicted the occupiers, OWS protests continued on a frequent basis until the fall of 2012, with more than 100 marches or other actions occurring during that period.

36.     After the eviction, Zuccotti Park remained a focus of OWS activity.  During daylight hours, OWS activity at Zuccotti Park remained nearly constant for several weeks.

---

[2] See Saul, Michael Howard, "Bloomberg: Occupy Wall Street Can Stay Indefinitely," THE WALL STREET JOURNAL, Oct 10, 2011, http://blogs.wsj.com/metropolis/2011/10/10/bloomberg-occupy-wall-street-can-stay-indefinitely/?mod=e2tw

37.     The arrests complained by the plaintiff in this action took place during the period of the occupation of Zuccotti Park and its aftermath.

38.     Throughout the first year of OWS, the NYPD continually and unlawfully arrested members of OWS who were simply engaged in peaceful protest activity.

39.     While some OWS protestors committed minor offenses, such as blocking vehicular traffic, the majority of protestors did not do so.

40.     There were very few instances of damage to property by protestors, and over the entire year in which OWS was most active, only a handful of instances in which a protestor was accused of any kind of violence, and zero instances of serious injury. Indeed, Defendant Mayor Bloomberg recognized that, "the majority of the protesters have been peaceful and responsible."[3]

41.     When making arrests at Occupy Wall Street protests, the police did not distinguish between the few protestors who may have committed offenses, and the many who did not. Instead, the police arrested many people who did nothing wrong. To justify these arrests, the police fabricated charges. The charges might be completely fabricated, or sometimes the police knowingly charged a protestor in custody with conduct that might have been committed by another protestor whom the police did not arrest.

42.     For example, on September 19, 2011, DEFENDANT INSPECTOR WINSKI made an arrest during an OWS protest march. Inspector Winski, through police spokesman Paul Browne, claimed that the person arrested jumped over a police barrier, and then resisted arrest. The New York Times revealed that, in fact, Inspector Winski reached across the police barrier and attempted to drag the protestor over the top of it. The barrier-jumping accusation was fabricated to justify an unlawful arrest.

43.     As another example, on September 24, 2011, Deputy Inspector Anthony Bologna pepper sprayed a group of OWS protestors, most of them young women, who were waiting on a sidewalk behind a police barrier where they had been confined by the police. Bologna, through NYPD spokesman Paul J. Browne, disseminated a fabricated story accusing the victims of criminal conduct which supposedly justified Bologna's use of force. Browne told The New York Times that police had used the pepper spray "appropriately," and only after victims had "confronted officers and tried to prevent them from deploying a mesh barrier." The "confrontation" was fabricated to justify the use of pepper spray and the victims' arrest.

44.     Police frequently arrested OWS protestors on sidewalks, claiming that the protestor was in the street blocking vehicular traffic in the street.

45.     Police frequently arrested OWS protestors who complied with police orders (or who was given no time to comply), fabricating allegations that the person refused to comply.

46.     The police used crowd control techniques that violated the free speech rights of OWS protestors.

47.     For example, on November 5, 2011, the police closed a sidewalk on Centre Street at Foley Square where a group of OWS protestors were holding a demonstration to celebrate the success of an Occupy supported program, Bank Transfer Day. It was a Saturday, and all of the buildings on Foley Square were closed to the public. The only people present were protestors

---

[3] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, GUARDIAN (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

and police.[4]  No purpose was served by the police sidewalk closure, except to create an opportunity to arrest protestors.

48.     There were twenty-one (21) arrests on this date that resulted in fifteen (15) dismissals, ACD's, declined prosecutions and/or acquittals.

49.     The NYPD practice of frequently "closing" sidewalks and forcibly moving along peacefully assembled individuals violates the freedoms of expression and assembly, and was documented as a pervasive NYPD practice during Occupy Wall Street.[5]

50.     A report found that police enforcement of the disorderly conduct statute for blocking pedestrian traffic against protesters was a tactic to "stifle political protest" that, when combined with physical force, created "a climate of fear."  "Many areas of New York City are heavily congested with pedestrian traffic, and the difference in treatment between congested resident or tourist pedestrian traffic and protester pedestrian traffic was at times stark."[6]

51.     The large majority of Occupy Wall Street related arrests during the first year in New York City were for offenses such as disorderly conduct—a non-criminal violation akin to jaywalking.  Yet, the vast majority of the protestors who were arrested were taken into police custody, whether for hours or for days, rather than simply being given a summons.

52.     Furthermore, between September 17, 2011 and September 17, 2012 – in Manhattan alone – 2,644 members of OWS were arrested. Only 409 of these arrests resulted in a plea or conviction for any charge.  That is a conversion rate of just over 15% for the thousands of Occupy Wall Street related arrests during the one-year period.  The remainder of the arrests, the overwhelmingly vast majority, were dismissed.

53.     To provide contrast, from 2010-2014, the success rates for all misdemeanor arrests in New York County was almost quadruple the OWS success rate (misdemeanor arrests and charges resulted in a conviction in 56% of the time).[7]  This comparison supports the allegation that during OWS people were more likely to be falsely arrested without probable cause or legitimate reason while engaged in free speech activities than in non-free speech activities.

54.     Numerous civil rights cases have been filed in this district alleging improper  (most pending, and some settled or resolved by accepted Rule 68 Offer - information concerning amounts provided as available) arising out of allegations of false arrest and excessive force that occurred in relation to OWS.  Annexed is a list updated as of March 9, 2016 indicating 30 open cases related to Occupy Wall Street (including three class actions) and 56 settled cases (ranging from $12,500 to $598,000) (See Summary **OWS v. NYPD cases in Southern District of New York.** Attached hereto.)

55.     As a result of these unlawful policies, Plaintiff was arrested numerous times and forced to leave New York City and abandon his efforts to support Occupy Wall Street and all political

---

[4]  Al Baker, *Police Force Wall Street Protesters Off Sidewalks*, NY TIMES, http://cityroom.blogs.nytimes.com/2011/11/05/police-force-wall-street-protesters-off-sidewalks/.

[5]  Knuckey, Sarah, et al., SUPPRESSING PROTEST: HUMAN RIGHTS VIOLATIONS IN THE U.S. RESPONSE TO OCCUPY WALL STREET, Published by The Global Justice Clinic (NYU School of Law) and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice (Fordham Law School), July 21, 2012 ("Suppressing Protest Report") at 118.

[6]  *See id.*

[7]  New York Division of Criminal Justice Services, Disposition of New York Adult Arrests, http://www.criminaljustice.ny.gov/crimnet/ojsa/dispos/newyork.pdf.

involvement. Mr. Vincent has not participated in any protest relating to Black Lives Matter, for example, or any other activism since 2012.

## THE PLAINTIFF'S ARRESTS

56.     An articulate and personable young man, in the early days of OWS, Plaintiff gave interviews to media regarding Occupy Wall Street, and led notables such as Russell Simmons on tours of Occupy Wall Street's Zuccotti Park encampment.

57.     Upon information and belief, Plaintiff's photograph was disseminated by the NYPD Intelligence Division among NYPD officers that policed OWS, because he was deemed a leader of OWS.

58.     As one of the few black men active in OWS, Plaintiff was easily identifiable.

59.     The Plaintiff asserts claims for false arrest arising from four separate incidents: a) the Plaintiff's Oct. 15, 2011 arrest during an OWS march on 6th Avenue near 37th Street; b) the Plaintiff's Oct. 26, 2011 during an OWS march on Reade Street near Broadway; c) Plaintiff's Nov. 8, 2011 arrest at Zuccotti Park during the OWS occupation; and d) the Plaintiff's Nov. 27, 2011 arrest at Zuccotti Park.

60.     None of the arrests were made pursuant to a warrant.

61.     Due to the unlawful arrests and filing of false information against Plaintiff, Plaintiff SEAN VINCENT was forced to appear in Court on these various charges on numerous dates including: October 15, 2011, October 26, 2011, November 8, 2011, November 21, 2011, November 27, 2011, November 30, 2011, December 15, 2011, December 30, 2011, January 10, 2012, January 30, 2012, March 12, 2012, May 14, 2012, May 16, 2012, May 23, 2012, October 10, 2012.

## THE PLAINTIFF'S OCTOBER 15, 2011 ARREST

62.     On October 15, 2011, Defendant PO CURLEY unlawfully arrested Plaintiff SEAN VINCENT, who was participating in a protest march up Sixth Avenue at the time of his arrest.

63.     On Sunday October 15, 2011, more than ten thousand protesters met in Times Square to protest. The Plaintiff was part of a group that marched from Washington Square Park up Sixth Avenue to join that large assembly in Times Square.

64.     While marching, the protesters carried signs, verbally chanted statements concerning economic inequality and the political and societal domination of corporations and the wealthiest 1% of our society. Plaintiff participated in these chants.

65.     Plaintiff, as a young man who sought to help and lead, began to act as a liaison between the NYPD and the marchers on both the east and west sidewalks of 6th Avenue.

66.     Plaintiff led the march on one side of Sixth Avenue and another protester led the march on the other side of Sixth Avenue. In order to keep the march on each side of Sixth Avenue together, Plaintiff and the leader on the other side spoke about three times on the march from Washington Square Park to Times Square

67.     The protesters stayed on the sidewalks. Some marched on the sidewalk on the east side of Sixth Avenue, and others marched on the west side of 6th Avenue.

68.   The Police Officers present encouraged Plaintiff in his efforts to keep these marchers on each side of Sixth Avenue to stay together and two officers walking with the protesters informed other NYPD officers about Plaintiff's role in leading the march.

69.   No officer told the Plaintiff that he should not do this.

70.   Nevertheless, without any contravening order to the Plaintiff, or any warning to the Plaintiff that he was violating any law, the Plaintiff was arrested and charged with Penal Law 240.20(5) and (6).

71.   Defendant PO CURLEY effectuated the arrest of Plaintiff SEAN VINCENT and became the arresting officer for this arrest.  As a result of this arrest, Plaintiff SEAN VINCENT was unable to participate in the protest in Times Square on October 15, 2011.

72.   In addition, Defendant PO CURLEY made materially false statements, offered as sworn testimony, concerning the Plaintiff's conduct.

73.   These false statements were made by PO Curley in a Criminal Complaint submitted to the Office of the District Attorney of New York ("DANY"), which initiated prosecution against the plaintiff, and were presented as evidence which might be used at trial.

74.   These false statements include statements that: a) Plaintiff entered the street repeatedly in violation of a lawful order, and b) that Plaintiff's actions caused public inconvenience, annoyance and alarm in that pedestrians were unable to walk on the sidewalk and pedestrians who were not part of the above group were forced to walk in the street.

75.   This was not true, Plaintiff did not violate any lawful order, and his conduct did not cause pedestrians to walk in the street.

76.   On October 10, 2012, these charges was dismissed.

THE PLAINTIFF'S 10/26/11 ARREST<br>DURING THE OAKLAND SOLIDARITY MARCH

77.   On October 26, 2011, Defendants PO WARING and PO MCNAMARA unlawfully arrested Plaintiff Sean Vincent.

78.   On October 25, 2011, over 100 officers from various police jurisdictions joined together for a midnight raid on the Occupy encampment in Oakland, CA.  It was a particularly violent raid that left a young military veteran of the Iraqi War hospitalized.[8]

79.   In a showing of support for the Oakland encampment from the different Occupy encampments in the world, "Oakland solidarity" marches and protest occurred the following day, around the world, including in New York City.

80.   Plaintiff participated in the Oakland solidarity march on October 26, 2011 in New York City.

81.   While marching the protesters carried signs, verbally chanted messaging concerning economic inequality and the political and societal domination of corporations and the wealthiest 1% of our society and in support of the Occupy encampment in Oakland, CA.  Plaintiff participated in these verbal chants.

82.   The march reached Broadway near Reade Street.

---

[8] The resulting lawsuit was eventually settled for $4.5 million dollars.

83.     Plaintiff was on the sidewalk on Reade Street just west of Broadway.

84.     Without issuing an order to the Plaintiff to disperse from the sidewalk, where the Plaintiff was lawfully present, NYPD officers grabbed Plaintiff, pulled him to the ground, placed Plaintiff's face firmly into the sidewalk before placing flexicuffs on him.

85.     Even at this early stage of OWS, it was obvious to those involved in the movement that the NYPD had a policy of falsely arresting those perceived to be leaders.  A bystander commented on video, in sum and substance, that Plaintiff SEAN VINCENT was arrested because the police "perceive him to be a leader.  He did nothing wrong, they just came onto the sidewalk and just grabbed him."

86.     Defendants PO WARING and PO MCNAMARA effectuated this arrest, and PO WARING became Plaintiff SEAN VINCENT's arresting officer.

87.     Plaintiff was charged with Penal law 195.05 and 240.20(5).

88.     Defendant PO WARING submitted false statements in a criminal complaint submitted to the District Attorney's office, which initiated prosecution against the plaintiff, and were presented as evidence which might be used at trial.

89.     Defendant PO MCNAMARA submitted false statements in a criminal complaint and supporting deposition submitted to DANY, and which were presented as evidence which might be used at trial.

90.     Among the false statements submitted to DANY was that Plaintiff was part of a group of 50 individuals locking arms in traffic lanes, and blocking traffic.

91.     None of this was true.  Plaintiff was not in the middle of the street, Plaintiff did not interlock arms with anyone, and the plaintiff did not block traffic.  At all relevant times, Plaintiff was on the sidewalk and in compliance with all NYPD orders, lawful and unlawful.

92.     Both PO WARING and PO MCNAMARA knew these statements to be false.

93.     On January 30, 2012, these charges were dismissed on motion of DANY.

### 11/8/11     FALSE ARREST AT ZUCCOTTI PARK

94.     On November 8, 2011, while in Zuccotti Park to participate in general assemblies and planning meetings, Plaintiff  began to exit the park by crossing Cedar Street heading south on Broadway when he was stopped by a member of the NYPD and ordered to go back into the Park and to stand behind metal barriers that were set up.

95.     After placing himself behind the barrier and learning that there was an allegation of a suspicious package somewhere north of Zuccotti Park in the opposite direction of where Plaintiff had been heading when stopped by the NYPD, Plaintiff inquired if he could continue south and be further away from the alleged suspicious package.

96.     The NYPD officer responded to the Plaintiff with the same instruction, to move behind the metal barrier.

97.     When Plaintiff received the above instruction, Plaintiff was already behind the barrier and wanted to absolutely ensure he was in compliance with this officer's order, and asked, "I am already behind the barrier, what do you want me to do ?"

98.     Immediately, Plaintiff was grabbed by PO Grodnick and arrested.  Plaintiff was charged with Penal law 195.05 and 240.20(6).

99.     Defendant PO Grodnick became the arresting officer, based upon information provided by Defendant Captain Thomas Traynor.

100.    Defendant PO GRODNICK and Defendant CAPTAIN TRAYNOR submitted false information to DANY to support a false criminal complaint that was filed against Plaintiff, thereby initiating prosecution against him.

101.    Defendant CAPTAIN TRAYNOR submitted false information to DANY directly and through Defendant PO GRODNICK concerning the arrest of the Plaintiff on November 8, 2011.

102.    Included in the false information provided to DANY was that Defendant CAPTAIN TRAYNOR asked Plaintiff four times to move from a location in Zuccotti Park and that Plaintiff refused.

103.    Included in the false information provided to DANY by Defendant CAPTAIN TRAYNOR was that Plaintiff interfered with an ongoing police investigation.

104.    Included in the false information provided to DANY by Defendant CAPTAIN TRAYNOR was that after refusing to move from Zuccotti Park, Plaintiff stated in sum and substance, "this is my park."

105.    This was not true.  Plaintiff was in compliance with all NYPD orders and had asked a simple question.

106.    Both Defendant PO GRODNICK and Defendant CAPTAIN TRAYNOR knew that these statements were not true when they were made.

107.    On October 10, 2012, these charges was dismissed.

<u>11/27/11 FALSE ARREST DURING THANKSGIVING WEEKEND</u>

108.    On November 27, 2011, Plaintiff was present in or near Zuccotti Park as Defendant NYPD INSPECTOR WINSKI, DETECTIVE JOSE CABRERA and DEFENDANT PO MANNING, and other officers, had detained another individual on the sidewalk on East side of Zuccotti Park by Broadway.

109.    Plaintiff walked by the individual under detention, and in a sign of camaraderie, gave this individual a single pat on the back of the shoulder as he passed.

110.    Immediately thereafter Plaintiff was instructed by officers present to stand a certain distance from the individual being arrested (identified in the criminal complaint of plaintiff as Mr. Henry Rogers), and plaintiff complied.

111.    The individual being arrested requested that the Plaintiff locate Mrs. Rogers and inform her that Mr. Rogers was being arrested.  As Plaintiff sought to hear the name of Mrs. Rogers, DETECTIVE CABRERA and DEFENDANT PO MANNING began a physical confrontation with Plaintiff.

112.    DETECTIVE CABRERA and DEFENDANT PO MANNING then seized, detained and arrested Plaintiff SEAN VINCENT without lawful cause, charging him with Penal law 195.05 and 205.30.

113.    DEFENDANT PO MANNING submitted false statements to the DANY in a criminal complaint that initiated prosecution against the plaintiff, falsely stating that Plaintiff repeatedly stepped between the arresting officer and the other arrested individual.

114.    This was not true.  Plaintiff was approximately fifteen feet away from the arrest of Mr. Rogers, with three or more NYPD officers physical located in the space between Plaintiff and Mr. Rogers.  Plaintiff never stepped between the arresting officer and Mr. Rogers.  The Plaintiff's  arrest was a violation of the NYPD's agreement to be bound by the Federal Consent decree in Black v. Codd, 73 Civ. 5283 (JNC), that is also incorporated in the NYPD patrol guide.

115.    Video of the November 27, 2011 incident contradicts DEFENDANT PO MANNING allegations against Plaintiff SEAN VINCENT.[9]

116.    Video of the November 27, 2011 arrest shows DEFENDANT INSPECTOR WINSKI was present during this entire interaction and had the ability, opportunity and obligation to intervene in this unconstitutional conduct and false arrest perpetrated against Plaintiff, yet DEFENDANT INSPECTOR WINSKI failed to intervene.

117.    DEFENDANT INSPECTOR WINSKI pointed at Plaintiff SEAN VINCENT just prior to Plaintiff being seen in the video.  This pointing was a message to the officers present that Plaintiff was a good candidate for arrest.  DEFENDANT INSPECTOR WINSKI could have intervened by instructing the arresting officers to release the Plaintiff.  But rather, the officers followed DEFENDANT INSPECTOR WINSKI's non-verbal command, and effectuated a false arrest of Plaintiff SEAN VINCENT.

118.    On October 10, 2012, these charges were dismissed.

FIRST CLAIM
DEPRIVATION OF RIGHTS UNDER THE
UNITED STATES CONSTITUTION AND 42 U.S.C. §1983

119.    The plaintiff incorporates by reference the allegations set forth in all previous Paragraphs as if fully set forth herein.

120.    By their conduct and actions in seizing plaintiff, searching plaintiff, falsely arresting and imprisoning plaintiff, assaulting and battering plaintiff, trespassing upon plaintiff, converting plaintiff's property, maliciously prosecuting plaintiff, abusing process against plaintiff, filing false information against Plaintiff and harming his rights to a fair trial, violating rights to due process of plaintiff, violating and retaliating for plaintiff's exercise of his rights to free speech and assembly, failing to intercede on behalf of the plaintiff and in failing to protect the plaintiff from the unjustified and unconstitutional treatment he received at the hands of other defendants, defendants WINSKI, TRAYNOR, BLANCO, CURLEY, WARING, GRODNICK, MANNING, MCNAMARA, BLOOMBERG and KELLY, acting under color of law and without lawful justification, intentionally, maliciously, and with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, caused injury and damage in violation of plaintiff's constitutional rights as guaranteed under 42 U.S.C. §1983 and the United States Constitution, including its First, Fourth, and Fourteenth amendments.

121.    As a result of the foregoing, plaintiff was deprived of his liberty and property, experienced injury, pain and suffering, emotional injury, costs and expenses, and was otherwise damaged and injured.

SECOND CLAIM FOR RELIEF
FALSE ARREST

---

[9] See Video attached hereto as Video Exhibit A.

122.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

123.    Plaintiff was arrested by Individual Defendants William Curley, Lisa Waring, John McNamara, William Grodnic, Thomas Traynor and PO Thomas Manning, without probable cause, without a warrant, and without the plaintiff's consent on October 15, 2011, October 26, 2011, November 8, 2011 and November 27, 2011.

124.    As a result of the above constitutionally impermissible conduct, Plaintiff suffered injuries, violations of his civil rights, loss of liberty, and other special damages.

125.    As a result of the police officers' impermissible conduct, the Plaintiff demands judgment against the City of New York and the Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

THIRD CLAIM FOR RELIEF
FAILURE TO INTERVENE

126.    The Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

127.    On November 27, 2011, Plaintiff was falsely arrested in the presence of Defendant WINSKI.

128.    Defendant WINSKI was both present for the entirety of the interactions between Plaintiff and Defendant PO Manning and NYPD Detective Cabrera, and in close proximity to this interaction so that he was able to observe the entirety of the interaction.

129.    Therefore, Defendant WINSKI could see, and knew, that the arrest was without basis, and violated the consent decree in *Black v. Codd*.

130.    Defendant WINSKI was under the obligation to intervene on behalf of the Plaintiff for the false arrest and violations of his constitutional rights.

131.    Defendant WINSKI has been a member of the NYPD since 1993, and on the date of this incident was a Deputy Inspector and commanding officer of the First Precinct.

132.    Defendant WINSKI has testified that in his entire NYPD career he has never intervened with another member of the NYPD and a civilian in regards to excessive force or a violation of constitutional or other rights.

133.    Defendant WINSKI was under the obligation to intercede in the false arrest of Plaintiff and despite having a reasonable opportunity to prevent, end, or truthfully report the misconduct to which Plaintiff was subjected, failed to intervene, thereby violating Plaintiffs rights under the Fourth, Fifth, Sixth and Fourteenth Amendments.

134.     As a result of the above constitutionally impermissible conduct, Plaintiff suffered injuries, violations of his civil rights, loss of liberty, and other special damages.

135.    As a result of Defendant WINSKI's failure to intercede in the other police officers' impermissible conduct, the Plaintiff demands judgment against the City of New York and the Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

FOURTH CLAIM FOR RELIEF
DENIAL OF PLAINTIFF'S FAIR TRIAL RIGHTS

136.    The Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

137.   Individual Defendants William Curley, Lisa Waring, John McNamara, William Grodnick, Thomas Traynor and PO Thomas Manning, created false evidence against Plaintiff SEAN VINCENT, creating or providing false evidence to prosecutors in the New York County District Attorney's office.

138.   In creating false evidence against Plaintiff, and in forwarding false information to prosecutors, individual Defendants violated Plaintiff's right to a fair trial under the Due Process Clause of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

139.   As a consequence thereof, Plaintiff SEAN VINCENT has suffered harms compensable by damages, including deprivation of liberty.


FIFTH CLAIM FOR RELIEF
VIOLATIONS OF AND RETALIATION FOR THE
EXERCISE OF RIGHTS TO FREE SPEECH AND ASSEMBLY

140.   The Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

141.   By the actions described above, defendants violated, and retaliated for the exercise of, the free speech and assembly rights of plaintiff.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the United States.

142.   Due to these multiple false arrests the Plaintiff left New York City and moved back to North Carolina.

143.   Due to these multiple false arrests, the Plaintiff stopped participating in First Amendment activities.

144.   As a consequence thereof, Plaintiff SEAN VINCENT has suffered harms compensable by damages.

SIXTH CLAIM FOR RELIEF
MALICIOUS PROSECUTION

145.   The Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

146.   Individual Defendants William Curley, Lisa Waring, John McNamara, William Grodnick, Thomas Traynor and PO Thomas Manning, acting willfully and maliciously, and without probable cause, commenced and continued false prosecutions against Plaintiff, and caused him to be prosecuted.

147.   Plaintiff was subject to significant post-arraignment liberty restraints.

148.   The criminal proceedings were terminated in Plaintiff's favor.

149.   As a consequence thereof, Plaintiff SEAN VINCENT has suffered harms compensable by damages.

FACTS RELATED TO SEVENTHTH CLAIM FOR RELIEF
MONELL LIABILITY

150.   Particular policies and customs implemented by Defendant THE CITY OF NEW YORK which proximately caused violation of the Plaintiff's Constitutional rights are these:

a. POLICY I: Defendant THE CITY OF NEW YORK has a policy and practice of failing to properly train the members of the service on the rights of protesters and the interplay of small offenses - such as disorderly conduct or obstruction of governmental administration - with the rights guaranteed under the U.S. Constitution.

b. POLICY II: Defendant THE CITY OF NEW YORK has a policy and practice of tracking, monitoring, surveilling and reporting on groups participating in First Amendment activities, and individuals associated with the group, in violation of the U.S. Constitution; and using this information to chill First Amendment activities of the individuals. The NYPD utilizes inappropriate and unlawful investigative techniques in furtherance of this policy, including the placement of short and long-term infiltrators in groups engaged in First Amendment activities; and using cell phone signal interceptors called Stingrays to surveil and disrupt these groups and individuals while they're participating in the groups' free speech activities absent probable cause or court order.

c. POLICY III: Defendant THE CITY OF NEW YORK has a policy and practice of arresting individuals selected at random from within groups engaging in peaceful protest, for the purpose of frightening and deterring the arrested individual and the remainder of those protesting.

## POLICY I: FAILURE TO TRAIN

151.   In August 2011, Defendant City of New York knew that large scale protests were planned in September 2011 (the protests that would ultimately begin on September 17, 2011).

152.   Even if Defendant City of New York did not have knowledge of the specific protests coming up in September 2011, Defendant City of New York knew that the city is the site of large political demonstrations on a regular basis.

153.   Defendant City of New York knew that members of its police force would encounter individuals engaged in political or expressive speech activity.

154.   Yet, the City of New York, Commissioner Kelly & Mayor Bloomberg made a decision not to provide adequate training to NYPD police officers in the handling of protesters exercising First Amendment rights.

155.   For example, DEFENDANT Inspector Winski testified in a deposition about the frequent training he has received since becoming a member of the NYPD, including sergeant training, lieutenant training, captain training, inspector training, lead training, baton training, fire arms training, pepper spray training, "20K" training and mass formation training, but DEFENDANT Inspector Winski could not recall any training pertaining to an individual's constitutional rights and appropriate policing of First Amendment activity. Nor did DEFENDANT Inspector Winski recall any training on the First Amendment or its effect on protestor activities prior to the First Anniversary of Occupy Wall Street.

156.   DEFENDANT Inspector Winski, however, testified that he believed that the fact that individuals are engaged in First Amendment-protected activity has no effect on the manner with which Penal Law 240 (disorderly conduct) is charged against them, in contravention of established legal precedent.

A.    The Principles of Proper Policing of Expressive Speech Activity

157.    Proper training for police officers who would be called upon to police public political or expressive speech activity would have consisted of clearly established guidelines for police conduct in expressive speech protest situations, including but not limited to these well established legal rights and principles:

a. Under New York State and federal law, a person cannot be arrested for   disorderly conduct for the "mere inconveniencing of pedestrians."

b. Under New York State and federal law, even if protestors block the entire sidewalk, causing pedestrians to step into the street, such conduct is not enough to justify arrest for disorderly conduct.

c. Under federal law, when a person is engaged in political or expressive speech activity, the First Amendment of the Constitution requires that the government, including the police, give fair warning to protestors that they must disperse before arresting them.

d. Under New York State law, if a person's conduct does not cause, or recklessly threaten to cause, a substantial impact on the public at large, such as a breach of the peace, then there is no probable cause for an arrest for disorderly conduct.

e. Under New York State and federal law, a person may only be subject to arrest if there is individualized probable cause to believe that the particular individual arrested committed an offense. Further, probable cause to make an arrest does not arise merely because of a person's presence within a group of people, even if some people in that group are committing offenses.

f. Under New York State and federal law, the police may not disperse a protest without having a lawful reason to do so.

g. Under New York State and federal law, a civilian breaks no law by refusing to obey an unlawful order to disperse.

h. Under New York State and federal law, a civilian cannot be arrested for obstructing governmental administration, for refusing to obey an unlawful order to disperse.

i. Under federal law and the First Amendment, it is unlawful to arrest a protestor for disorderly conduct unless the protestor is creating a "clear and present danger" of breach of the peace.

j. Under federal law and the First Amendment, where the municipality and/or the police seek to regulate the time, place or manner of public protest, protestors must be provided an adequate forum for their expression.

k. Under the Consent Decree entered in *Black v. Codd,* 73 Civ. 5283, that when a person (or persons) is detained, stopped or arrested in public areas, a person or persons not involved in the conduct for which the first person is stopped or arrested may remain in the vicinity of the stop or arrest as an onlooker.

l. Under the Consent Decree entered in *Black v. Codd,* 73 Civ. 5283, none of the following constitute probable cause for arrest or detention of an onlooker unless the safety of officers or other persons is directly endangered or the officer reasonably believes they are endangered or the law is otherwise violated;

   i. Speech alone, even though crude and vulgar;

   ii. Requesting and making notes of shield numbers or names of officers;

      iii.     Taking photographs;

      iv.     Remaining in the vicinity of the stop or arrest.

158.    Proper training in these clearly-established principles of lawful police conduct would have prevented unlawful arrests of OWS protestors including those of the plaintiff.

159.    Like most NYPD officers,[10] Inspector Winski's training on issues relating to Constitutional law only occurred during the brief six-month period spent at the Police Academy, without any subsequent training on these issues.

      B.    <u>The City of New York, Commissioner Kelly & Mayor Bloomberg Knew Police Officer Training Was Insufficient To Properly Police the Occupy Wall Street Protests</u>

160.    Police assigned to OWS events, including the events during which the plaintiff was arrested, were drawn from throughout the NYPD.

161.    Borough Task Forces, and the Disorder Control Unit, were sometimes assigned to OWS events, because of these units' additional training in crowd control and mass arrests.

162.    However, regardless of the police unit to which they were assigned, officers had no training in Constitutional issues relating to freedom of speech or political protest after their six months of academy training before beginning their careers.

163.    Upon information and belief, these officers never had any training which included the principles listed above.

164.    Before the Occupy Wall Street movement began, the NYPD's failure to properly train police was exposed through litigation surrounding arrests made during the 2003 sidewalk protest of the Carlyle Group office.  Protestors were arrested while lawfully on the sidewalk without blocking pedestrian traffic.  52 plaintiffs sued for wrongful arrest, and the case settled for two million dollars.[11]

165.    The NYPD's failure to properly train police was further exposed through litigation surrounding the thousands of arrests made during the Republican National Convention in 2004. Settlement of these cases cost the City of New York more than thirty million dollars.[12]

166.    In anticipation of Occupy Wall Street, the City of New York, Commissioner Kelly & Mayor Bloomberg did conduct large-scale training for the NYPD in August 2011 on Randall's Island, but this training focused on methods of making mass arrests.

167.    Importantly, and unfortunately for the innumerable protesters whose rights were violated, including the Plaintiff, the August 2011 training did not include any training about proper policing of expressive speech activity protected by the First Amendment.  Nor did this training include the proper standards for arrest related to disorderly conduct when expressive speech activity was involved.

---

[10] Numerous other members of the NYPD also testified in depositions that they received no First Amendment training once they left the Police Academy.

[11] http://ccrjustice.org/home/what-we-do/our-cases/kunstler-v-city-new-york

[12] The City paid approximately $18 million dollars in damages and fees to plaintiffs, and spent $16 million defending the lawsuits to outside counsel and the NYC Law Department.  http://www.reuters.com/article/2014/01/15/us-usa-newyork-rnc-settlement-idUSBREA0E1S120140115

168.    Furthermore, the inadequacy of the training was continually highlighted over the following year by the extensive arrests, the exceptionally high rate at which arrests were voided, declined for prosecution, or dismissed.

169.    OWS protests were policed not merely by patrol officers, but by high-ranking officers such as DEFENDANTS INSPECTOR WINSKI and INSPECTOR CAPTAIN TRAYNOR, among others.

170.    These high-ranking officers observed and knew or should have known that NYPD officers were incorrectly understanding and applying the law.

171.    These high ranking officers knew or should have known how to correct the conduct to prevent these unlawful arrests, or to report these problems up the chain of command to Defendants Kelly and Bloomberg in order to prevent NYPD officers from making unlawful arrests because of a failure to understand the law.

POLICY II: TRACKING, MONITORING, SURVEILLING AND REPORTING ON POLITICAL GROUPS AND INDIVIDUAL PROTESTORS

A.    NYPD Has a History & Practice of Tracking, Monitoring And Surveilling First Amendment Groups

172.    Since at least the period leading up to New York's 2004 Republican National Convention, when police monitored church groups, anti-war organizations and environmental advocates nationwide, the NYPD intelligence division has been tracking, monitoring, surveilling and reporting on groups and individuals involved in First Amendment activity.

173.    Investigators with the NYPD Cyber Intelligence Unit monitor websites of activist groups, and undercover officers put themselves on email distribution lists for upcoming events.

174.    Plainclothes officers collect fliers on public demonstrations.

175.    The NYPD has also engaged in long-term undercover surveillance of political and religious groups, which undercover officers assume a false identity, join the group, and participate in its activities.

176.    The NYPD uses these infiltrated undercover officers to report on the targeted group's meetings, activities and membership.

177.    The identity of one undercover infiltrator of OWS, Det. Wojciech Braszczok, became known by accident when he was indicted for several violent felonies committed while undercover.  This officer's activities within OWS included joining planning committees and urging OWS activists to break laws by intentionally blocking traffic during the September 17, 2012 anniversary of OWS.  Det. Braszczok also participated in one protest action whose apparent purpose (from the perspective of the undercover) was to provide an opportunity to arrest the two authentic OWS protestors who, together with Det. Braszczok, released a handful of balloons inside Grand Central Station.[13]

178.    During the same time period, one NYPD officer professed conversion to Islam in order to join a Muslim student organization at Brooklyn College.  This officer immersed herself in the lives of her targets, to the point of serving as a bridesmaid at the wedding of one of them.  The

---

[13] These arrests resulted in two lawsuits each resulting in settlements between $10,000 and $20,000. See *Kostakis v. MTA, et al.*, 12CV7108(PGG)(GWG), & *Engler v. MTA, et al.*, 12CV7378.

undercover's infiltration lasted several years.  No one in the Brooklyn College group was ever connected with any wrongdoing.

179.    The NYPD has never disclosed any information about its political infiltration and surveillance activities except under court order, or in the exceptional case of Det. Braszczok's indictment.

180.    Litigation related to the Republican National Convention ("RNC") disclosed 593 pages of NYPD reports consisting of tracking, monitoring and surveilling individuals and groups involved in First Amendment activities.

181.    For example, the NYPD infiltrated and monitored Billionaires For Bush, a political group that uses satire to express opposition to the domination of the nation's politics by the extremely wealthy.  Billionaires For Bush express their views through public theatrical performance, by (for example) dressing up as caricatures of wealthy people, and ironically expressing their support for oligarchy.

182.    The NYPD infiltrated the meetings of Billionaires For Bush in 2003 and 2004.

183.    As another example, the NYPD infiltrated and monitored Times Up!, a non-profit bike collective that conducts training in bicycle repair, and advocates for less reliance on fossil fuels.

184.    The NYPD infiltrated the meetings of Times Up! in 2003 and 2004.

185.    The NYPD has even conducted undercover surveillance of political activities occurring out of state.

186.    In 2008, the NYPD tracked and monitored First Amendment groups gathering in New Orleans at the People's Summit.  An undercover NYPD officer traveled to New Orleans and reported back to the Deputy Commissioner David Cohen, the Head of the NYPD Intelligence Division NYPD, on three groups involved in organizing and protesting political activities such as U.S. immigration policy, labor laws and racial profiling.

187.    This unconstitutional report also identified by name a journalist, a labor organizer for housekeepers and nannies, and five student officers of the College of the City of New York Muslim Student's Organization.   The journalist, Jordan Flaherty, later told reporters that his involvement in the People's Summit was limited to participation in a film festival.

188.    The fact that the NYPD sent an undercover operative to infiltrate a film festival in New Orleans, shows that the NYPD considers its authority to engage in domestic spying to be essentially unlimited.

> B.    NYPD Ignored Civil Rights Directives of Homeland Security While Tracking, Monitoring, Surveilling and Reporting On Occupy Wall Street Before and After 9/17/11

189.    Prior to September 17, 2011, the NYPD began to collect data and information about the Occupy Wall Street movement.

190.    Upon information and belief, the NYPD began compiling information on Occupy Wall Street before August 2011.

191.    DEFENDANT Inspector Winski has testified about receiving reports prior to September 17, 2011, that individuals planned on sleeping near the New York Stock Exchange.

192.    Immediately after Occupy Wall Street began its physical occupation of Zuccotti Park, it became clear that the NYPD was tracking, monitoring, surveilling and reporting on the movement.

193.    DEFENDANT Inspector Edward Winski admitted in deposition to having regular intelligence reports from the NYPD Intelligence Division during Occupy Wall Street, and also receiving and reviewing photographs of individuals associated with Occupy Wall Street.

194.    DEFENDANT Inspector Edward Winski also testified in deposition to having received and reviewed photographs of individuals associated with Occupy Wall Street.

195.    Individuals associated with Occupy Wall Street frequently reported that officers knew their names and what OWS affinity group and/or committee which they worked on, despite having had no apparent way of obtaining this knowledge themselves.

196.    For example, Marisa Holmes, plaintiff in Holmes v. City of New York, 14-cv-05253, alleged that Detective Kenneth O'Donnell of the NYPD Legal Bureau called her by name prior to arresting her, and that the officer had no reason to have knowledge of her name.  Upon information and belief, Detective O'Donnell regularly received information from the NYPD Intelligence Bureau.

197.    Soon after September 17, 2011, the NYPD sent both long-term and short-term infiltrators into Occupy Wall Street.

198.    Police Officer Vincent Boccio testified to his knowledge that Brooklyn North Task Force placed at least one undercover officer at Zuccotti Park.

199.    Police Officer Christopher Ventura testified that on one occasion when he was involved in the arrest of an OWS activist, NYPD Intelligence officers learned of the arrest before it was even processed, and contacted the arresting officers for information about the activist.

200.    On November 17, 2011, while at Zuccotti Park, journalist Erik Macgregor noticed an individual in the park with a bottle of vodka, acting inebriated and trying to get others to drink with him. Erik believed the individual to be a police infiltrator. Erik found a uniformed member of the NYPD, and pointed out the individual with the vodka to two uniformed officers and then observed this same individual approach the various uniform officers with familiarity and as Erik asked the officers what they were going to do about this individual and his bottle of vodka, he observed the NYPD officers do nothing and the short-term infiltrator simply walked away.

201.    On December 5, 2011 at World Financial Center, NYPD officers began to indiscriminately grab individuals involved in protest activity for arrest.  One individual that was grabbed was let go when a different officer said, "she's one of us."  Upon information and belief, that person was an undercover police officer.

202.    However, the most well-documented example of undercover infiltration of OWS by the NYPD is the case of (former) NYPD Detective Wojciech Braszczok, mentioned briefly above.

203.    In 2013, Det. Braszczok, at the time a ten-year veteran of the NYPD, was revealed as a long-term NYPD infiltrator into Occupy Wall Street and *agent provocateur*.

204.    The NYPD that revealed this information, after Det. Braszczok committed several violent felonies while engaged in a subsequent (unrelated) undercover assignment.

205.    Had Det. Braszczok not been indicted, his activities would have remained unknown.

206.    Upon information and belief, there are a number of other long-term undercover infiltrators of OWS whose identities and activities remain unknown to this day.

207.    When he infiltrated OWS, Det. Braszczok was working for the NYPD Intelligence Division.

208.    Det. Braszczok successfully infiltrated the Occupy Wall Street movement by attending and participating in OWS events and activities on a daily or near-daily basis at Zuccotti Park and elsewhere, from October 2011 to April 2013.

209.    While acting as an undercover officer, Det. Braszczok would track, monitor and surveil OWS and report back to the NYPD on the First Amendment activities of OWS and the individuals involved in OWS.

210.    Det. Braszczok frequently attended social gatherings that involved his OWS targets, including birthday parties.

211.    Even after the occupation of Zuccotti Park had ended on November 15, 2011, Det. Braszczok continued to track, monitor and report on the activities of Occupy Wall Street.

212.    As an example, on June 14, 2012, members of Occupy Wall Street participated in a march from Zuccotti Park to the High Line in solidarity with Quebec.

213.    Det. Braszczok participated in the march, positioning himself with the organizers of the march, gathering information about the march and the organizers to relay to the Intelligence Division.  According to reports, police making arrests at this march used unnecessary force on protestors after they had been cuffed, including one protestor who was deliberately kicked in the head while lying cuffed on the pavement.

214.    During his time as an undercover at Occupy Wall Street, Det. Braszczok organized one protest action that resulted in three (3) arrests, including his own, at Grand Central Station.

215.    During his time as an undercover at Occupy Wall Street, he utilized social media, including a twitter account under the handle @evovillen, to further enhance his good standing with Occupy Wall Street.   As an example, on April 6, 2012, in anticipation of Occupy Wall Street's May Day activities, Det. Braszczok tweeted,  "Come join us in spring training by occupying the stock exchange today at 2:30pm.  Hope to see you there."

216.    During his time as an undercover at Occupy Wall Street, he joined organizing meetings seeking to elevate the activity of the protestors.

217.    Det. Braszczok was part of the organizing committee for the one year anniversary and suggested that the protestors "should be out on the streets blocking traffic."

218.    After OWS, Det. Braszczok infiltrated a motorcycle gang which was involved in an attack on a young couple and their infant child.  For his role in the incident, Det. Braszczok was indicted on November 1, 2013,[14] arraigned on November 11, 2013, convicted on June 4, 2015. He was sentenced to two years imprisonment on August 5, 2015.

219.    All of these charges arise out of conduct that Det. Braszczok committed while working undercover for the NYPD Intelligence Division.

        C.    NYPD Intelligence Division & Counter-Terrorism Bureau

---

[14] Det. Braszczok was charged with in a nine count indictment with a litany of violent felonies, ranging from two B felonies (including Gang Assault (P.L. 120.05.(2) and Assault in the 1st degree (P.L. 120.10(1)), five D felonies (including two counts of  Coercion in the first degree ( P.L. 135.65(1) and two counts of Assault in the 2nd degree)), and one E felony (Riot in 1st Degree, P.L. 240.06(1)).

220.    Upon information and belief, the unlawful and unconstitutional tracking and monitoring of Occupy Wall Street was instituted, devised and overseen Defendants Michael Bloomberg and Ray Kelly, acting through the NYPD Intelligence Division & Counter-Terrorism Bureau.

221.    The NYPD Intelligence Bureau in its current form was created by Defendants Michael Bloomberg and Ray Kelly.

222.    Kelly appointed David Cohen Deputy Commissioner of Intelligence in January 2002.

223.    Previously, Cohen was a retired Senior Intelligence Service officer of the CIA, and had been the CIA's Deputy Director for Operations.  Cohen had worked for the CIA for decades, but had no prior police experience.

224.    A former top department official recently described NYPD Intelligence Division as it is referred to inside the department, as "a mini-CIA" within a municipal agency, without the safeguards to ensure that it does not break the law.

225.    Bloomberg, Kelly and Cohen increased the size of the Intelligence Division to approximately 1,200 police officers.

226.    From 2002 through 2004, a CIA agent named Lawrence Sanchez was assigned to work under David Cohen, while remaining on the payroll and staff of the office of the Director of Central Intelligence of the CIA.  Beginning in 2004, Sanchez took a leave of absence from the CIA, and took a paid position with the NYPD, while retaining his CIA clearance.

227.    Cohen and Sanchez imported CIA infiltration and surveillance techniques – spycraft, essentially -- into NYPD practice.

228.    However, there was (and is) a difference between the CIA and the NYPD Intelligence Division.  The NYPD operates in greater secrecy, with less oversight, and fewer restrictions on the scope of its own activities.

229.    The CIA, for example, operates within the parameters of Executive Order 12333 (46 F.R. 59941).  The CIA, and agency of the executive branch, is subject to the day to day oversight by the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence.

230.    The NYPD Intelligence Division is not subject to any consistent legislative oversight.

231.    In 2003, limitations previously placed on NYPD surveillance of political groups by the Handschu consent decree were removed, and the Handschu Authority ceased to convene.

232.    In the wake of 9/11, the Department of Homeland Security created a structure to promote coordination and exchange of information among for local and federal law enforcement and security agencies.  This system included "fusion centers," which were (and are) offices staffed by representatives from federal, state and local agencies.  The NYPD is one of the participating agencies in the New York-area fusion center, the New York State Intelligence Center.

233.    The Department of Homeland Security ("DHS") oversaw the fusion centers. In the early days of Occupy Wall Street DHS promulgated its official position concerning OWS, which was published to participating agencies in the fusion centers, including the NYPD:

> [DHS] supports the position that the Occupy Wall Street-type protests mostly are engaged constitutionally protected activity.   We maintain our longstanding position that DHS should not report on activities when the basis for reporting is political speech. … To a

large degree, these protests are no different from any other protests/events from civil liberties, civil rights and privacy perspectives.

234.    DHS concluded that investigation of OWS or other First Amendment groups or their participants was not justified absent "illegal or suspicious behavior related to a DHS mission that occurs during the protests."

235.    During the time relative to the arrests of the Plaintiff, the NYPD had two distinct groups of officers involved in the local fusion center, regular NYPD officers and NYPD Intelligence officers.

236.    The Department of Homeland Security ("DHS") policy included express limits on domestic surveillance of First Amendment groups:

> The government may never collect or disseminate information based solely on First Amendment protected  activities, or conduct investigations on that basis.
>
> Generally, reporting should be about the violence or criminality of a particular individual or group. Reporting on activities without a nexus to violence or criminality often raises First Amendment concerns.
>
> To justify research into and creation of a product [i.e., an investigation or report] containing First Amendment protected activity, personnel should consider whether they have a lawful predicate (e.g. a lawful purpose to perform their authorized law enforcement functions or other activities, that is not based on the protected activity itself).
>
> Once a lawful predicate has been established, personnel should ensure the scope of the research and reporting on First Amendment protected activity is limited to the threat posed. This is often referred to as congruence.

237.    The NYPD Intelligence Division did not obey these policies or observe these limitations.

238.    NYPD Intelligence Division continued to make unilateral decisions without regard to legal rights of those it was policing.

239.    In emails subsequently disclosed, an Senior FBI agent wrote of the NYPD's conduct, as he observed it from the New York fusion center:

> [Officers from NYPD Intelligence Division] are also listening to Cohen who, near as anybody can tell, never had to make a criminal case or testify in court. I keep telling you, you and I are going to laugh and raise a beer one day, when everything intel has been involved in during the last 10 years comes out – it always eventually comes out.  They are going to make Hoover, COINTEL, Red Squads, etc. look like rank amatures (sic) compared to some of the damn right felonious activity, and violations of US citizen's rights they have been engaged in.

240.    Even after OWS, the NYPD continue to track, monitor, surveil and report on Free Speech activities.  NYPD Intelligence Division and other law enforcement agencies, monitored and recorded Black Lives Matter demonstrations occurring on 23 days in just four months from November 2014 through February 2015.

241.    Information shared between MTA and NYPD police personnel included photographs and identification of individuals associated with Black Lives Matter, as well as "anti-police activist" J.L. [full name in report], and Rev. Billy Talen, another non-violent political advocate who engages in frequent public protests.

242.    On January 1, 2015, police personnel from the Interagency Counterterrorism Task Force took photographs and filed reports in conjunction with the NYPD Intelligence Division, and transmitted photographs of a "female agitator" and other demonstrators. In an email of February 13, 2015, police personnel recorded and transmitted a photograph of social activist videographer/photographer A.S. (full name in report) despite the absence of criminal activity or plans for criminal activity.[15]

        D.      <u>Domestic Surveillance of Political and Religious Groups is Inherently Dangerous to a Free Society</u>

243.    The 9/11 Commission stated in the executive summary to its final report: "Secrecy stifles oversight, accountability, and information sharing."[16]   In other words, secrecy – in particular "overclassification" of information – was one of the causes of the intelligence failures that allowed 9/11 to happen.

244.    While undercover investigation of suspected criminals or criminal enterprises is essential, investigation of college students, journalists, political advocates and film festivals does nothing to advance the detection or prevention of crime.  At the same time, domestic political surveillance creates a grave risk that surveillance of purely social and political targets will be undertaken to pursue purely social and political ends.  This has happened in the past, which is why we need to be on high alert any time the police are found to be engaging in political surveillance.

245.    An example from the previous era of rampant political surveillance is the FBI surveillance of Martin Luther King.  Starting in 1963, the FBI placed Martin Luther King under constant surveillance, whom an FBI memo described as an "unprincipled opportunistic individual" whose work was leading towards a "Negro-labor coalition which the communists hope to be able to manipulate as a potent political action weapon."[17]   Internally, the FBI's stated goal in collecting information on King was "neutralizing King as an effective Negro leader."[18]

246.    In 1964, the FBI sent an anonymous letter to King, purportedly from a disgruntled "Negro," calling Dr. King a "complete fraud," and demanding that he kill himself within 34 days: "There is but one way out for you. You better take it before your filthy, abnormal fraudulent self is bared to the nation."[19]

247.    The US Select Committee on Assassinations of the U.S. House of Representatives found that "It is highly probable that James Earl Ray stalked Dr. King for a period immediately preceding the assassination."  One cannot help but wonder if the FBI – had it not been focused

---

[15] It should be noted that the FOIL request that resulted in the disclosure of these communications were simultaneously served on the MTAPD and the NYPD.  The MTAPD disclosed the documents cited herein.  The NYPD refused to disclose any documents responsive to the same FOIL request even though they were on many of these same emails.

[16] THE 9/11 COMMISSION REPORT: FINAL REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES, EXECUTIVE SUMMARY, p. 24, available at:
   http://govinfo.library.unt.edu/911/report/911Report_Exec.pdf

[17] Memorandum of F.J. Baumgardner, December 19, 1963: "Subject: Communist Party USA, Negro Question, Communist Influence in Racial Matters."

[18] Memorandum of W.C. Sullivan, December 24, 1963: "Subject: Communist Party USA, Negro Question, Communist Influence in Racial Matters."

[19] Christensen, Jen, "The FBI's secret memos show an agency obsessed with "neutraliz(ing)" MLK," CNN.com November 14, 2014, available at, http://www.cnn.com/2014/11/14/us/fbi-and-mlk/; 1964 Draft Letter (anonymous) from FBI files.

on bringing about the disgrace and possible suicide of Martin Luther King -- might have prevented his assassination at the hands of the domestic terrorist who was, like the FBI itself, "stalking" Dr. King.

248.    This is an illustration of the reason why, in this country, we draw a line between investigations targeting individuals and groups for their *illegal conduct*, and investigations that target individuals and groups for their *political activities*.  The history of domestic political surveillance in this country is ugly and dangerous.  In the 1970's we seemed to be poised to learn from this history.  Now we seem poised to repeat it.

249.    A security agency that cannot or will not distinguish between political and criminal groups is dangerous and un-American.  Unfortunately, today's NYPD is such an agency.

## POLICY III: THE CITY OF NEW YORK HAS A POLICY AND  PRACTICE OF ARRESTING INDIVIDUALS SELECTED AT RANDOM FROM WITHIN GROUPS ENGAGING IN PEACEFUL PROTEST, FOR THE PURPOSE FRIGHTENING AND DETERRING THE REMAINDER OF THOSE PROTESTING

250.    Upon information and belief, Defendant THE CITY OF NEW YORK has implemented a policy pursuant to which individuals are selected at random for arrest from within a group of protestors, in order to create fear in other protestors that they too will be subject to arrest.

251.    One feature of random arrests is that the police arrest certain individuals who are engaging in lawful activity, and who are engaging in activity which differs in no legally significant way from that of other individuals present at the same time and place.

252.    Upon information and belief, the purpose of this tactic is to deter protestors from engaging in protest.  The tactic is effective because it creates confusion as to what conduct the police consider lawful, or will permit, and what conduct will subject the individual to arrest.

253.    Upon information this tactic actually achieves the desired result of deterring other individuals from lawful participation in Occupy-related activities.  Arresting even a relatively small proportion of those lawfully engaging in a protest is an effective deterrent.  If the NYPD regularly arrested every 100th person entering Macy's, people would very quickly stop going to Macy's.  Months and thousands of arrests after the Occupy Wall Street movement began, these abusive tactics substantially impacted the size and frequency of events.

254.    Journalists covering OWS demonstrations and marches have witnessed and reported such random arrest tactics.

255.    Concerning arrests on September 24, 2011 near union square, a reporter for the Chronicle of Higher Education wrote: "In the same way that ocean trawlers capture indiscriminately, officers penned hundreds of peacefully marching Occupy Wall Street protesters together with bystanders, pedestrians, reporters, and neighborhood residents. Witnesses called police targeting of detainees 'random.'"

256.    Concerning arrests near the Brooklyn Bridge on October 1, 2011, a reporter for The New York Times reported that arrests of Occupy-affiliated protestors appeared to be "random and aggressive."  ABC News similarly reported "random" arrests taking place.  The following day, Mayor Michael R. Bloomberg ratified these tactics stating, "The police did exactly what they were supposed to do."

257.    Concerning an OWS protest on March 17, 2012, the New York Times reported that protestors engaged in peaceful and lawful protest were being randomly selected for arrest.

258.    Concerning an OWS protest on September 15, 2012, a reporter for Gothamist.com also reported random arrests during a march from Washington Square to Zuccotti Park, and identified such random arrests as a recognizable tactic consistently employed by the NYPD at Occupy-related protests: "NYPD officers in white shirts [were] throwing people into the sidewalk, and … police were singling protesters out, seemingly at random, to be arrested. The tactic is a hallmark of the NYPD's policing of Occupy Wall Street demonstrations, both large and small."

259.    Reporting on a protest on September 17, 2012, a journalist for The Atlantic made the same observation: "At times, police seemed to outnumber protesters, and some arrests during the protest seemed random: An officer would point out an individual in the crowd, and then a group [of officers] would rush in and grab the target."  A journalist who was himself arrested while covering this event reported: "NYPD was randomly grabbing people 3-5 at a time throughout the march."

## MONELL LIABILITY

## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

260.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

261.    Defendants The City of New York, Mayor Bloomberg, and Commissioner Kelly established and/or followed policies, procedures, customs, and/or practices, that were the cause of violation of the Plaintiff's constitutional rights.

262.    The City of New York, Mayor Bloomberg, Commissioner Kelly, breached their duties and obligations to the Plaintiff when they implemented, caused and/or condoned POLICY I, POLICY II, and/or POLICY III as stated herein.

263.    The Plaintiff's October 15, 2011 arrest was the result of POLICY I, POLICY II, and/or POLICY III.  Had the police been properly trained that the First Amendment bars the arrest of a protestor in the absence of clear and present danger of breach of the peace; and is not justified merely where some pedestrians must step into the street, the Plaintiff would not have been arrested.  The Plaintiff's arrest was without probable cause, and while he was obeying all orders made to him.  POLICY III is characterized by arrests of compliant protestors for the purpose of deterring those and other protestors from engaging in further protest.  Defendant Curley's allegation that Plaintiff – by entering the street – prevented people from using the sidewalk is nonsensical and indicative of pretext.  The timing of this baseless arrest, and the Plaintiff's leadership within the group prior to his arrest, shows that POLICY II was a motivating factor in the arrest.

264.    The Plaintiff's October 26, 2011 arrest was the result of POLICY I, POLICY II, and/or POLICY III.  Had the police been properly trained that the First Amendment bars the arrest of a protestor in the absence of clear and present danger of breach of the peace; and is not justified where a protestor is simply on a sidewalk and has not been ordered to disperse, the plaintiff's arrest would not have happened.  The Plaintiff's arrest was without probable cause, while he was on the sidewalk, and when no order to disperse had been made to him.  POLICY III is characterized by arrests of compliant and law abiding protestors for the purpose of deterring those and other protestors from engaging in further protest.  The defendants' completely false allegations concerning the Plaintiff  are indicative of pretext.  The fact that this baseless arrest was the Plaintiff's fourth, and that he was selected out of others present engaging in the same

conduct who were not arrested, shows that the plaintiff was the target of police enforcement individually because of NYPD perception that he was a leader in OWS.

265.    The Plaintiff's November 8, 2011 arrest was the result of POLICY II.  The Plaintiff was targeted for arrest while complying with all police orders that had been made to him.  The fact that this baseless arrest was the Plaintiff's fifth, and that he was selected out of others present engaging in the same conduct who were not arrested, shows that the plaintiff was the target of police enforcement individually because of NYPD perception that he was a leader in OWS.

266.    The Plaintiff's November 27, 2011 arrest was the result of POLICY I, POLICY II and/or POLICY III.  Had the officers involved been properly trained in the rule of Black v. Codd, the Plaintiff's arrest would not have happened.  The facts that DEFENDANT INSPECTOR WINSKI pointed to the Plaintiff before his arrest, together with the fact that this was the Plaintiff's 6th arrest in relation to Occupy, indicates that the Plaintiff was at that point known to police and being targeted by them, pursuant to POLICY II.  The Plaintiff's arrest while lawfully observing the arrest of another protestor from a distance is an example of the POLICY III, making unlawful arrests of protestors to discourage that and other protestors from further protest.

267.    Plaintiff has sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

PRAYER FOR RELIEF

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

   i.   Declare the policies of the NYPD, set out above, to be unconstitutional;

  ii.   Award general damages in an amount to be determined by proof at trial;

 iii.   Award appropriate compensatory and punitive damages;

  iv.   Enter an order enjoining the City of New York and the NYPD from continuing the unconstitutional policies, procedures, customs, and/or practices of arresting individuals engaged in expressive free speech, as protected under the First Amendment, for disorderly conduct without actual criminal conduct;

   v.   Award attorneys' fees and costs; and

  vi.   Provide such further relief as may be just and proper and in the interests of justice.

DATED:        May 10, 2016                STECKLOW & THOMPSON

                                         _____--//s//--_____
                                         Wylie M. Stecklow
                                         David A. Thompson
                                         217 Centre Street, 6th Floor
                                         New York, New York 10013
                                         Tel.:   (212) 566-8000
                                         Fax:    (212) 202-4952

Summary **OWS v. NYPD cases in Southern District of New York**
Settled:

| Caption | Index | Settlement |
|---|---|---|
| Adona v. NYC, et al | 12-cv-7458 (HB) | Rule 68 $25,001 + $35,000 fees |
| Adsluf v. NYC, et al | 13–cv-2295 (LGS) | settled $40,000 |
| Appel v. NYC, et al | 14-cv-07992 (KPF) | settled $20,000 |
| Arce v. NYC, et al | 13-cv-8486 (PKC) | settled $22,500 |
| Baglieri v. NYC, et al | 12-cv-07012 (HB) | settled |
| Ball v. NYC, et al | 13-cv-05563 (RWS) | settled |
| Boss v. NYC, et al | 12-cv-8728 (GBD) | settled $55,000 |
| Brown v. NYC, et al | 13-cv-2058 (NRB) | settled $15,000 |
| Clarke. et al. v. NYC, et al | 13-cv-5303 (RWS) | settled Union Square 9/24/11 |
| Crisp v. NYC, et al | 12-cv-5842 (RWS) | settled Union Square 9/24/11 |
| Dedrick v. NYC, et al | 12–cv-7165 (RWS) | settled Union Square 9/24/11 |
| Dierken. et aI. v. NYC, et al | 12-cv-07462 (RWS) | Settled $145,009, + $112,500 fees Union Square    9/24/11 |
| Elliot. et aI. v. NYC, et al | 12-cv-992 (RWS) | settled Union Square 9/24/11 |
| Fields v. NYC, et al | 13-cv-8819 (JGK) | settled $75,000, + $15,000 fees |
| Freedman v. NYC, et al | 15-cv-01956 (JPO) | settled |
| Friesdat v. NYC, et al | 14-cv-625 (JGK) | settled |
| Frydman v. NYC, et al | 12-cv-09394 (SAS) | settled |
| Global Revolution TV v. NYC, et al | 12-cv-5086 (GBD) | settled $75,000, + $50,000 fees |
| Gold v. NYC, et al | 13-cv-02142 (VSB) | settled |
| Hanlin v. NYC, et al | 12-cv-5844 (RWS) | settled Union Square 9/24/11 |
| Hopkins v. NYC, et al | 14-cv-09114 (LGS) | settled $25,000 |

| | | |
|---|---|---|
| Iskender v. NYC, et al | 13-cv-2899  (RA) | settled $33500 |
| Jimenez v. NYC, et al | 14-cv-413 (RA) | settled |
| Knefel v. NYC, et al | 13-cv-08881(LTS) | settled $13,000 |
| Koznar v NYC, et al | 15-cv-01484 (SAS) | settled |
| Laugier v NYC, et al | 13-cv-6171 (HB) | settled, $85,000 |
| Lawler v. NYC, et al | 12-cv-5843 (RWS) | settled |
| Meighan v. NYC, et al | 12-cv-7929 (AKH) | settled $55,000 |
| Meltzer-Cohen v. NYC, et al | 14-cv-516 (SAS) | settled |
| Morris v. NYC, et al | 12-cv-07219 (SAS) | settled |
| Nelson v. NYC, et al | 14-cv-09249 (WHP) | settled |
| Occupy Wall Street et al. v. NYC, et al | 12-cv-4129 (GBD) | settled $47,000, + $186,349.58 fees |
| Peat et al v. NYC, et al | 12-cv-8230 (SAS) | settled $598,000 |
| Penley v. NYC, et al | 14-cv-01577(JGK) | settled $25,001 plus $30,000  fees |
| Perloff v. NYC, et al | 13-cv-4175 (KBF) | settled |
| Powell et al v. NYC, et al | 14-cv-08138 (RMB) | settled |
| Premo v. NYC, et al | 13-cv-08141 (WHP) | settled |
| Rechtschaffer v. NYC, et al | 13-cv-0709 (JPO) | settled |
| Reinheart/Eastman v. NYC, et al | 13-cv-8314 (JPO) | settled $40,000 |
| Rivera-Pitre V. NYC, et al | | settled |
| Ross. et al. v. NYC, et al | 13-cv-5012 (VSB) | settled $22,000 |
| Russell  v. NYC, et al | 13-cv-9047 (ALC) | settled |
| Schmidt v. NYC, et al | 13-cv-961 (DLC) | settled $15,002, +$18,000 fees |
| Schoeckert v. NYC, et al | 13-cv-06342 (VEC) | settled |
| Schomburg v. NYC, et al | 12-cv-7161 (RWS) | settled |
| Schrader v. NYC, et al | 13-cv-1995 (HS) | settled $82,500 |

| | | |
|---|---|---|
| Smith v. NYC, et al | 13-cv-02900 (JPO)(JLC) | settled $17,500 |
| Sterling. et al. v. NYC, et al | 12-cv-7086 (RWS) | settled Union Square 9/24/11 |
| Stoeckley & McGregor v. NYC, et al | 13-cv-6173 (VSB) | settled $57,000 |
| Time's Up Inc v. NYC, et al | 13-cv-1081 (GBD) | settled $8500 |
| Treffs v. NYC, et al | 12-cv-3030 (HB) | settled $27,500 |
| Walker v. NYC, et al | 12-cv-09400 (LTS) | settled |
| Wilder v. NYC, et al | 14-cv-8953 | settled |
| Worden v. NYC, et al | SETTLED WITHOUT SUIT FILED | settled $12,500 |

Open

| Case | Index |
|---|---|
| Allen v. NYC, et al | 15-cv-01918 (PKC)(MHD) |
| Arbuckle v. NYC, et al | 13-CV-10248 (ER) |
| Bogart v. NYC, et al | 13-CV-1017 (NRB) |
| Brown v. NYC, et al | 13-CV-1018 (KAF) |
| Caravahlo et al v. NYC, et al | 13-CV-04174 (PKC)(MHD) |
| Case et al v. NYC, et al | 14-CV-09148 (AT) |
| Collins et al v. NYC, et al | 14-CV-08815 (AJN) |
| Dekuyper v. NYC, et al | 14-CV-08249 (DLC) |
| Douglas v. NYC, et al | 14-CV-08124 (ALC)(AJP) |
| Faraone v. NYC, et al | 13-CV-9074 (DLC) |
| Gersbacher v. NYC, et al | 14-CV-07600 (GHW) |
| Gonzalez v. NYC, et al | 14-CV-07721 (LGS) |
| Higginbotham v. NYC, et al | 14-CV-08549 (PKC) |

| | |
|---|---|
| Holmes v. NYC, et al | 14-CV-05253) (LTS(RLE) |
| Kass v. NYC, et al | 14-CV-0705 (ALC)(GWG) |
| Marlin v. NYC, et al | 15-CV-2235 (CM) |
| Marom v. NYC, et al | 15-CV-02017(PKC)(MHD) |
| Martinez v. NYC, et al | 14-CV-08686 (KPF) |
| McMIllan v. NYC, et al | 15-CV-01962 (JMF) |
| Mediavilla v. NYC, et al | 14-CV-8624 (VSB) |
| Meyers et al v. NYC, et al | 14-CV-09142 (ALC) |
| Packard v. NYC, et al | 15-CV-7130 (AT)(RLE) |
| Pesola v. NYC, et al | 15-CV-01917 (PKC)(MHD) |
| Phoebe Berg. et al v. NYC, et al | 12-CV-3391 (TPG) |
| Richardson v. NYC, et al | 15-CV-5775 (PKC) |
| Rodriguez et aI. v. WInski, et al | 12-CV-3391 (TPG) |
| Soto v. NYC, et al | 13-CV-08474-LTS-JLC |
| Tardif v. NYC, et al | 13-CV-4056 (LTS) |
| Vincent v. Winski, et al. | 14-CV-7744 (VSB) |
| Wiles v. v. NYC, et al | 13-CV-2898 (HB) |